EdiZONE, LLC
Casey K. McGarvey (4882)
123 East 200 North
Alpine, Utah 84004
(801) 936-1039
casey@edizone.com

Attorney for Plaintiff,
EdiZONE, LLC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| EDIZONE, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>ROWMARK, LLC, a Delaware limited liability company, SPECTRUM MARKING MATERIALS, LLC,  a Rhode Island limited liability company, and DOES 1 – 10,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case No.:  2:15-cv-00789-PMW<br><br>Magistrate Judge Paul M. Warner |

Plaintiff, EdiZONE, LLC, hereby alleges and claims against Defendants, Rowmark, LLC, Spectrum Marking Materials, LLC, and Does 1 – 10, as follows:

PARTIES, JURISDICTION & VENUE

1.      Plaintiff, EdiZONE, LLC (hereafter "EdiZONE"), is a Delaware limited liability company with its principle place of business in Alpine, Utah.  EdiZONE is the current owner of the patent referenced below.

2.      On information and belief, EdiZONE believes the following as to each of the Defendants:

a.      Defendant Rowmark, LLC ("ROWMARK") is a Delaware limited liability company with its principle place of business in Findlay, Ohio.  ROWMARK has the same address as and formerly was known as Rowmark, Inc.  ROWMARK is the successor of Rowmark, Inc. and perhaps other entities in the line of succession.  ROWMARK sells and distributes various products, including "MATES" products, throughout the United States of America.  In Utah, ROWMARK's products are distributed through Delvie's Plastics, 133 W. Haven Ave., Salt Lake City, Utah.

b.      Defendant Spectrum Marking Materials, LLC ("SPECTRUM") is a Rhode Island limited liability company with its principle place of business in Block Island, Rhode Island.  SPECTRUM has the same address as and formerly was known as Spectrum Marking Materials, L.L.C., a Connecticut limited liability company.  SPECTRUM is the successor of its Connecticut predecessor and perhaps other entities in the line of succession.  SPECTRUM manufactures the MATES products and distributes them throughout the United States of America, including in Utah, through ROWMARK.

c.      Defendants Does 1 – 10 are entities or individuals who have induced or contributed to ROWMARKS's or SPECTRUM's actions pertaining to their MATES products or who have used their MATES products in ways that violate EdiZONE's rights in its patent at issue in this action or are otherwise liable to EdiZONE for patent infringement as alleged herein, and leave will be sought hereafter to bring them into this action as deemed necessary or appropriate and/or their identities become known.

2

3.      On information and belief, Defendants conduct business in the State of Utah or otherwise have substantial contacts with Utah and avail themselves of the benefits and protections of Utah law by shipping, distributing, selling or using products in Utah or in the stream of commerce with the intent that they are sold to consumers or used within the State of Utah.  Each Defendant has committed patent infringement within the State of Utah in violation of the laws of the United States of America.

4.      Accordingly, on information and belief, this Court has personal jurisdiction over ROWMARK and SPECTRUM and will have personal jurisdiction over the other Defendants when they are added.

5.      Subject matter jurisdiction and venue are founded upon 28 U.S.C. §§ 1331, 1338(a), 1391(b)(1) and (2), and 1400(b).

GENERAL ALLEGATIONS

6.      On February 11, 2002, Tony M. Pearce ("Mr. Pearce") filed a provisional patent application on his invention of methods for using biaxially stretched polyester as a photoreceptive layer for dye sublimation printing.

7.      Upon information and belief, beginning in mid-December 2003 and continuing to the present, ROWMARK began marketing and distributing new sublimatable products named MATES (sublimatable sheetstock of pre-adhesive plastic), mouseMATES (sublimatable mouse pads), magMATES (sublimatable flexible magnetic material), mugMATES (sublimatable coasters), and placeMATES (sublimatable counter mats) (collectively "MATES").  A copy of ROWMARK's marketing material for mouse MATES is attached as Exhibit A and incorporated

3

herein.  A picture of a sublimated mouseMates (mouse pad) product ROWMARK used to promote sales is shown below:



8.      These MATES products are manufactured and distributed to ROWMARK by SPECTRUM.

9.      In chemistry, "sublimation" means a change directly from the solid to the gaseous state without becoming a liquid, as commonly seen in the evaporation of dry ice.  Sublimation also can occur with dye that is transferable from a transfer source (such as a paper with a printed picture or message on it) to a different medium (such as plastic) through a sublimation process. The sublimation process for dye can include applying pressure and heat to the transfer source when placed against the chosen sublimatable medium.

10.     Defendants' sublimatable MATES products are sold by Defendants for use by customers in the sublimation printing process as the medium for receiving a transfer of dye from a transfer medium, for example, a chosen picture or graphic.

11.     The MATES products are sublimatable because such dye is transferable from the chosen transfer medium through the sublimation printing process into the MATES products.

12.     A sublimated mouseMATES product as shown above is seen below to have a white substrate laminated to biaxially stretched polyester ("BSP") that is pealed back from the white substrate at the top left corner.  On information and belief the other sublimatable MATES products likewise have a white substrate laminated to BSP.



13.     When selecting these materials to make a sublimatable product used in the sublimation printing process, a vibrant copy of the desired picture or graphic is transferred into the durable BSP surface allowing such sublimated products to be used as customized mouse pads, magnets, coasters or counter mats.

14.     The MATES products have no other use and are not sold in commerce for any other purpose than as a customizable sublimatable medium for sublimation printing of a picture or graphic from a transfer medium.

15.     ROWMARK described the desired sublimation printing process to be used with Defendants' sublimatable MATES products as follows: "Under the heat and pressure of a heat press, sublimation inks are specially formulated to convert directly from a solid to a gas." ROWMARK has stated that different levels of pressure and pressure times should be applied to

its various sublimatable MATES products, depending on the product, but the press should be preheated to 400°F.  See the copy of ROWMARK's "sublimation process" and "temperature & press times" webpages attached as Exhibit B and incorporated herein.

16.     On January 15, 2004, the United States Patent and Trademark Office ("USPTO") published Mr. Pearce's patent application covering his invention of methods for using BSP as a photoreceptive layer for dye sublimation printing.

17.     On or about January 28, 2004, Mr. Pearce informed Rich Zydonik ("Mr. Zydonik") of ROWMARK of Mr. Pearce's patent application and pointed out to ROWMARK that its new mouseMATES product appears to be covered by at least one of the claims in the patent application.

18.     Mr. Zydonik referred Mr. Pearce's letter to David Morrison ("Mr. Morrison") of SPECTRUM who responded to Mr. Pearce by admitting SPECTRUM is the manufacturer of the MATES lines of sublimatable products which are constructed and used in the manner described in Mr. Pearce's patent application.

19.     Mr. Morrison also claimed that SPECTRUM's products have been sold and used by customers since February 1999, asserting that such prior sales rendered any issued patent on Mr. Pearce's application unenforceable against SPECTRUM and ROWMARK.

20.     Mr. Pearce responded to Mr. Morrison's claim by pointing out that Mr. Morrison did not state that the MATES products, specifically BSP film over a white substrate, are among SPECTRUM's products that have been sold and used by customers since February 1999 or that the method for making such products was publically disclosed.

21.     Mr. Morrison replied that: "Since February 1999, Spectrum has sold products to be dye-sublimation printed that include biaxially oriented clear PET films with white substrates, constructed and used in the manner described in your patent application . . ."

22.     No sample products or documentation supporting that claim of prior use were provided by SPECTRUM to Mr. Pearce, and Mr. Pearce is not aware of any such products or public disclosure of the method for making such products prior to the date he filed his provisional patent application.

23.     Instead, prior art used for dye sublimation printing included, among other technologies, polymer film which is polymer coated with polyester or other polymers (i.e., PET films) not thicker BSP discovered by Mr. Pearce to have advantages over such previously practiced technologies by providing more vibrant color, clarity, detail and depth.

24.     Mr. Pearce first became aware of the use of his invention when ROWMARK began marketing Defendants' new MATES products in December 2003, boasting that it has built a better sublimatable mouse pad and further claiming that this was new, in fact was the newest sublimatable product on the market (which is in conflict with Mr. Morrison's later claim to Mr. Pearce that this product was being sold since 1999).

25.     Upon information and belief, any prior sublimation products sold by ROWMARK, a self-proclaimed industry leader in supplying sublimation products, used older, different technology than the technology of selecting BSP over a white substrate for use in a dye sublimation printing process.

26.     In fact, ROWMARK responded to Mr. Pearce's initial notice through its patent attorney who did not raise the claim of prior use made by Mr. Morrison, but instead simply asked

for a copy of the prosecution history for Mr. Pearce's patent application so he could evaluate what occurred during the USPTO's consideration of the patent application.

27.     Mr. Pearce responded to ROWMARK's attorney by providing to him a copy of the publically available patent application published by the USPTO, explaining to him that he could not give any weight to SPECTRUM's position on prior public use because no evidence of such use had been provided, and asking to be informed by him of ROWMARK's intentions.

28.     Neither ROWMARK nor its attorney attempted to provide any such evidence of prior use of the patented invention, nor did either inform Mr. Pearce of ROWMARK's intentions.

29.     Mr. Pearce never heard from ROWMARK or SPECTRUM again.

30.     The USPTO ultimately granted Mr. Pearce's patent application.

31.     On May 10, 2005, U.S. Patent No. 6,890,883 (the "883 Patent") issued on Mr. Pearce's invention, with Claims 1-13 being unchanged and Claims 14-25 being amended by additional terms added to independent Claim 14 in comparison to how these claims read when they were included in the previously published patent application.

32.     These claims are method claims comprising of steps to be taken for dye sublimation printing of photographs or graphics onto BSP.

33.     Claim 1 of the 883 Patent is an independent claim that states as follows:

> 1.     A method for dye sublimation printing of photographs or graphics onto biaxially stretched polyester compromising the steps of:
> obtaining a quantity of biaxially stretched polyester ("BSP") that has some
>         crystallinity in its polymers in order to reduce any inherent tendency of
>         said BSP to adhere to a sheet of transfer paper during a dye sublimation
>         printing process,
> said BSP being a clear film having a thickness of from about 0.0001 to about
>         0.014 inches,

selecting a white substrate,

laminating said BSP clear film to said white substrate to produce a laminate with a BSP clear layer,

said white substrate and said BSP remaining adjacent each other while carrying out said dye sublimation printing,

said white substrate being of a thickness that affords relative light opacity to said substrate,

selecting a piece of transfer medium containing a photograph or graphic for dye sublimation printing,

disposing said transfer paper against said BSP clear layer of said laminate,

disposing said transfer paper and said BSP clear layer of said laminate in a press,

closing said press to apply pressure to said transfer medium and said BSP clear layer of said laminate,

causing said transfer paper and said BSP clear layer of said laminate to be exposed to heat,

keeping said press closed for a desired time period in order to cause a photograph or graphic image on said transfer paper to be transferred to said BSP clear layer of said laminate by dye sublimation printing,

opening said press, and

removing said laminate to reveal a printed image.

34.    Claim 14 of the 883 Patent is an independent claim that states as follows:

14.    A method for dye sublimation printing of photographs or graphics onto biaxially stretched polymer film comprising the steps of:

obtaining a quantity of laminate that has a white substrate and a clear film located on said white substrate, said clear film being biaxially stretched polymer film selected from the group consisting of BSP and BSPN,

said clear film having some crystallinity in its polymers in order to reduce any inherent tendency of said clear film [to] adhere to a sheet of transfer paper during a dye sublimation printing process,

said white substrate being of a thickness that affords relative light opacity to said substrate,

and transferring a photographic or graphic image into the clear film by means of dye sublimation.

35.    Claim 15 of the 883 Patent is a dependent claim that adds the following limitation to Claim 14:

15.    A method as recited in claim 14 wherein the dye sublimation transfer is accomplished by means of a flat heat press, a printer, or a heated roller press.

9

36.     Claim 16 of the 883 Patent is a dependent claim that adds the following limitation to Claim 15:

> 16.     A method as recited in claim 15 wherein said dye sublimation transfer involves a temperature of at least about 200 degrees F.

37.     On or about June 24, 2005, Mr. Pearce sent notification to ROWMARK's Mr. Zydonik that the 883 Patent issued, and Mr. Zydonik was given in the notice a link to the uspto.gov website where Defendants could read the patent.

38.     Defendants provided no response to this notice.

39.     The Defendants' MATES products embody all of the materials required in the steps pertaining to obtaining and selecting materials for the laminate to be disposed with a transfer medium in a press and exposed to heat for a period of time in order to transfer an image from the transfer medium to the laminate by means of dye sublimation.

40.     Upon information and belief, Defendants directly practiced and continue to practice all the steps of these claimed methods of dye sublimation printing, such as when making dye sublimated products used to support their sales of the MATES products as shown by the picture of the mouse pad inserted above.

41.     To the extent Defendants sell their MATES products to customers, the acts of their customers are attributed to Defendants because directions to their customers require for proper use of the MATES products their customers' practice of the remaining steps of disposing the MATES products with a transfer medium in a press and applying heat for a period of time in order to accomplish the dye sublimation printing upon the MATES products as disclosed by these methods.

42.     The acts of Defendants' customers when using the MATES products are attributable to Defendants because each Defendant benefits from its customers' payments to it for the right to obtain and use the MATES products as a laminate in these patented methods of dye sublimation printing, and Defendants have the right and ability not to sell their MATES products for this purpose to prevent or limit infringement by their customers.

43.     The acts of Defendants' customers when using the MATES products are attributable to Defendants because those customers can only avail themselves of the intended benefit of sublimation printing with the use of the MATES products by performing the remaining steps of using the MATES products with a transfer medium in a press with exposure to heat as claimed in these patented methods, as directed by Defendants in their instructions.

44.     In addition to Defendants' direct acts, including those acts attributed to them, while knowing of the 883 Patent Defendants also induced their customers to practice all the steps of the patented methods by selling their MATES products with directions that their customers use these products by practicing all the steps of the patented methods, and their customers used the MATES products in this manner to customize these products for their own purposes.

45.     Also, again while knowing of the 883 Patent Defendants further contributed to their customers practice of all the steps of the patented methods by selling their MATES products for use in practicing the patented methods by their customers' obtaining and selecting their MATES products as the laminate, a material part of the invention to be disposed with a transfer medium in a press and exposed to heat for a period of time in order to receive an image from the transfer medium by means of dye sublimation printing, knowing their MATES products

11

were especially made for use in practicing the steps of the patented method and were not a commodity suitable for any other use.

46.     As for these direct and indirect acts, SPECTRUM admitted that the MATES products were constructed and used in the manner taught in the patent application that issued as the 883 Patent, and Defendants cannot credibly deny that their use of the MATES products and the use of their MATES products by their customers results in the practice of all the steps of the patented methods.

47.     Defendants have not provided any explanation to support a defense of non-infringement of the 883 Patent.

48.     This action is brought now, over ten years after the 883 Patent issued, because it could not have been brought sooner due to the patent-holder's involvement in other litigation.

49.     Further, Defendants have not suffered evidentiary prejudice because they were put on notice of the patent application and need to obtain and preserve evidence before the 883 Patent issued, and through ROWMARK they were put on notice of the issuance of the patent and Mr. Pearce's continuing belief that there was a conflict with their MATES products when they chose to continue thereafter to use and sell those products without responding back to Mr. Pearce.

50.     They have not suffered economic prejudice because they had developed their MATES products before the issuance of the 883 Patent and before suit could have been brought, and only are subject to paying a reasonable royalty for use of the 883 Patent for a limited period of time, six years prior to when this action was initiated through the life of the 883 Patent, which

means that the extent of their liability is less than it otherwise could be had this action been initiated earlier.

51.     Also, Defendants have acted in bad faith by not providing to Mr. Pearce samples of their products sold since February 1999 that SPECTRUM claimed to have had "biaxially oriented clear PET films with white substrates, constructed and used in the manner described in your patent application," or any supporting documentation pertaining to the technology used to make those products, so that those samples or documents could be evaluated by Mr. Pearce.

52.     EdiZONE will pursue this action if Defendants refuse to pay to EdiZONE fair compensation for past, present and future use of the patented property owned by EdiZONE, as required by law.

53.     EdiZONE reserves its right to assert additional patent claims in this action, as more information is received during discovery.

CLAIM FOR RELIEF

54.     EdiZONE incorporates herein its allegations set forth above in this Complaint.

55.     Through various assignments, the 883 Patent is now legally assigned to and owned by EdiZONE who is solely entitled to recover damages for infringement of the 883 Patent.

56.     Defendants have had actual notice of the 883 Patent, or at least constructive notice arising from their actual prior possession of the patent application.

57.     Defendants do not have a licensed right under the 883 Patent to make or use the patented methods in the United States of America by using BSP as a photoreceptive layer for dye sublimation printing.

13

58.     Accordingly, Defendants are liable to EdiZONE for direct infringement of the 883 Patent, either literally or through the doctrine of equivalents, in violation of 35 U.S.C. § 271(a).

59.     Defendants also are liable to EdiZONE for indirect infringement by inducing the infringement of their customers in violation of 35 U.S.C. § 271(b).

60.     Defendants also are liable to EdiZONE for indirect infringement by contributing to the infringement of their customers in violation of 35 U.S.C. § 271(c).

61.     EdiZONE is entitled to recover from Defendants monetary damages in an amount no less than a reasonable royalty determined from a rate applied to the base of the retail sales price for all the units of MATES products used or sold for use in practicing the steps of the patented methods by themselves or their customers.

62.     Such reasonable royalties should be paid on all such units used and sold during the period of six years prior to the date of the initiation of this action to the end of the term of the 883 Patent, so long as MATES products continue to be used and sold.

63.     Upon information and belief, EdiZONE also is entitled to recover from Defendants exemplary damages up to three times EdiZONE's damages, as determined by the Court, because Defendants have willfully infringed the 883 Patent in disregard of EdiZONE's rights.

<u>PRAYER</u>

WHEREFORE, EdiZONE prays for the following relief from each Defendant:

1.     A monetary judgment to compensate EdiZONE for past, present and future damages allowed by law, including at a minimum a reasonable royalty and prejudgment and post judgment interest thereon;

14

2.      A monetary judgment for exemplary damages;

3.      An award of its costs and attorney's fees as allowed by law; and

4.      All such other relief as the Court deems necessary and appropriate in law or
equity.

JURY DEMAND

EdiZONE demands a trial by jury on all factual issues presented herein pertaining to the

parties' rights in law or equity.

DATED this 9th day of November, 2015.


   /s/ Casey K. McGarvey_____
Casey K. McGarvey
Attorney for EdiZONE, LLC

EXHIBIT A



## *Eeeekk....Rowmark proudly introduces our newest product line!*



the better sublimatable mouse pad

You won't want to miss this exciting opportunity to offer your customers the newest sublimatable product on the market.  This new mouse pad is now available exclusively from Rowmark distributors.

**To show you exactly what we mean, we are sending you a mouseMATES sample.  Once you see the product for yourself, you will understand why this product is certain to be your customers' favorite choice.**

| | |
|---|---|
| Features: | *Attractive high gloss surface* |
| | *Flexible rubber backing keeps the mouse pad from shifting* |
| | *Produces images with brilliant color and clarity* |
| | *Durable, washable surface that will provide a long product life* |
| | *Dry-erasable surface* |
| | *Can also be used with thermal ink transfer systems.* |
| Product Specifications: | *Item Code = MP62-0810* |
| | *Size = 7.75" X 9.75 " with 1.5" radius corners* |
| | |
| | *High gloss white sublimatable surface laminated to a 1/8" rubber substrate with an overall thickness of 0.135"* |
| Fabrication Instructions: | *Heat Press at 400° F  (204° C)* |
| | *75 seconds with medium to heavy pressure* |

**For more information, contact your authorized Rowmark distributor or our Customer Service Representatives:
877-ROWMARK • inquiries@rowmark.com • www.rowmark.com**

## EXHIBIT B

Rowmark - The Sublimation Process

  

HOME   SAMPLE & LITERATURE REQUEST   NEWS & EVENTS   CONTACT US

products | find a distributor | technical help | sales tools | downloads   Chat Off-Line

**sublimation >>**

sublimation products
sublimation process
temperatures & press times
sublimation samples & templates
downloadable files
questions & answers
MSDS information
technical help



### The Sublimation Process
**It's as easy as 1...2...3...**

With sublimation, reproducing full-color images onto signage, name badges, awards, gift items and more is easy!

With a computer, graphic design software program, sublimation printer, heat press and Rowmark's full line of sublimatable products, you are ready to produce the most vibrant, full-color sublimation images in the industry!



**Step 1:** With your graphic design software program, let your imagination run wild to create colorful and personalized designs. Or import any electronic image, photograph or clip art into your software program. Once you have produced, imported or scanned your electronic artwork, you can print your own transfers directly from your printer.

**Step 2:** With a sublimation inkjet printer (such as the Ricoh GX 7000 pictured right) and sublimation cartridges, you are ready to start printing sublimation transfers. This system can produce vibrant color that surpasses silk screening or hot stamping - perfect for logos, photos, clip art or other images.



**Step 3:** Under the heat and pressure of a heat press, sublimation inks are specially formulated to convert directly from a solid to a gas. While in a gaseous state, the inks are attracted to certain types of synthetic surfaces. The inks actually penetrate and bond with the substrate's surface so that a permanent,



http://www.rowmark.com/sublimation/Sublimation123.asp[5/13/2014 3:19:16 PM]

17

Rowmark - The Sublimation Process



durable image is
created. Other heat
transfer methods only
apply color to
the surface of the substrate, resulting in a product that
can be easily scratched or damaged.

**How do I get started:** If you already have a computer
and a graphic design software program, you can get
started in sublimation with a minimal capital investment.
Additional investments would include an Epson 900 or
3000 printer, sublimation ink cartridges, transfer paper
and a heat press.

Sign-up to receive Rowmark's E-newsletter. Enter email here: _enter_

home | about rowmark | industry links | warranty statement | privacy | sitemap | distributor login

Rowmark - Sublimation Temperatures & Press Times



HOME    SAMPLE & LITERATURE REQUEST    NEWS & EVENTS    CONTACT US

Search

products | find a distributor | technical help | sales tools | downloads    

**sublimation >>**

sublimation products
sublimation process
temperatures & press times
sublimation samples & templates
downloadable files
questions & answers
MSDS information
technical help

SUPPORT
TECHNICAL HELP & PRODUCT SUGGESTION GUIDE

## Sublimation Temperatures & Press Times

**ColorLine Products:**

| | |
|---|---|
| Temperature: | Preheat press to 400°F/204°C. |
| Recommended Press Time: | 60 seconds - unless otherwise noted. |
| Pressure: | Medium to heavy. |
| Note: | When pressing a large plaques or when pressing a large area of a solid dark color-press times may need to be increased. |

**magMATES (Br. Silver, Br. Gold, Brite Gold, Chrome):**

| | |
|---|---|
| Temperature: | Preheat press to 400°F/204°C. |
| Recommended Press Time: | Press for 10-20 seconds, adjust time as necessary. |
| Pressure: | Light. |
| Note: | magMATES may be pressed with the backing down between 2 sheets of Teflon or between 2 pieces of a sacrificial paper. |

**MATES (White):**

| | |
|---|---|
| Temperature: | Preheat press to 400°F/204°C. |
| Recommended Press Time: | 60 - 70 seconds. |
| Pressure: | Medium to Heavy Pressure. |
| Note: | White MATES may be pressed with the backing down between 2 pieces of a sacrificial paper. |

**MATES:**

| | |
|---|---|
| Temperature: | Preheat press to 400°F/204°C. |
| Recommended Press Time: | 20-40 seconds. |
| Pressure: | Light Pressure. |
| Note: | MATES may be pressed with the backing down between 2 pieces of a sacrificial paper |

**placeMATES:**

| | |
|---|---|
| Temperature: | Preheat press to 400°F/204°C. |
| Recommended Press Time: | 60-75 seconds. |
| Pressure: | Light to Medium Pressure. |
| Note: | If creases appear in the placeMATE - the pressure is to heavy. |

**mouseMATES:**

| | |
|---|---|
| Temperature: | Preheat press to 400°F/204°C |
| Recommended Press Time: | 60-75 seconds. |
| Pressure: | Light to Medium Pressure. |
| Note: | If creases appear in the mouseMATE - the pressure is to heavy. |

**mugMATES:**

| | |
|---|---|
| Temperature: | Preheat press to 400°F/204°C |
| Recommended Press Time: | 60-75 seconds. |

Rowmark - Sublimation Temperatures & Press Times



| | |
|---|---|
| **Pressure:** | Light to Medium Pressure. |
| **Note:** | If creases appear in the mugMATE - the pressure is to heavy. |

Sign-up to receive Rowmark's E-newsletter. Enter email here:  enter

home | about rowmark | industry links | warranty statement | privacy | sitemap | distributor login